```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Sherman W. Crabtree,            :

        Plaintiff,              :

    v.                          :     Case No. 2:13-cv-711

                                :     JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,      Magistrate Judge Kemp
                                :
        Defendant.
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Sherman W. Crabtree, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. Those applications were filed on September 30, 2009, and alleged that Plaintiff became disabled on January 1, 2008 (later amended to December 1, 2009).

After initial administrative denials of his applications, Plaintiff was given a videoconference hearing before an Administrative Law Judge on January 5, 2012. In a decision dated January 25, 2012, the ALJ denied benefits. That became the Commissioner's final decision on June 5, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on September 30, 2013. Plaintiff filed his statement of specific errors on November 4, 2013. The Commissioner filed a response on January 6, 2014. No reply brief has been filed, and the case is now ready to decide.

II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 36 years old at the time of the administrative hearing and had graduated from high school (but in

special education courses from the eighth to the twelfth grades), testified as follows. His testimony appears at pages 40-59 of the administrative record.

Plaintiff was first asked about his past work. He said all of his jobs had lasted only a month or two, after which he would quit based on his belief that he could not do the job. Often he got warnings about not being able to keep up before he quit, although the last job he left was a stocker for Wal-Mart and he had transportation problems that forced him to quit. He had difficulties with that job, too.

In April, 2009, he sought treatment at Tri-County Mental Health due to suicidal thoughts. He went to counseling for about a year but again had transportation issues, causing a six-month break in treatment. At the time of the hearing, he was seeing counselors frequently and a doctor every six months. He described daily depression and frequent suicidal thoughts. Plaintiff also reported some physical problems with his hip and back.

As far as psychological symptoms were concerned, Plaintiff testified to mood swings, outbursts of anger, and crying spells. He was uncomfortable in large crowds and thought that his nerves prevented him from working. On the physical side, Plaintiff was having pain in his right leg which limited his ability to sit for more than an hour. He could walk half a mile. His lifting was limited to ten or twenty pounds.

In response to questions from the Administrative Law Judge, Plaintiff said that he had worked as a stocker in a grocery store for about three years but his "brain told me that I couldn't do it" any longer and he quit. He had a driver's license and drove to the grocery store. He did household chores such as cleaning, sweeping, and laundry. He had never gone to vocational rehabilitation, and no one had ever told him he was not able to

work.

### III. The School and Medical Records

The school and medical records in this case are found beginning on page 252 of the administrative record. The pertinent records - those relating to Plaintiff's psychological condition, since that is the only issue raised in his Statement of Errors - can be summarized as follows.

Plaintiff graduated from high school in 1994. His report card shows that he was in LD classes but did well, especially in his senior year, although he failed a number of the ninth grade proficiency tests (he passed holistic writing and citizenship).

The first psychological record in the file is a Mental Functional Capacity Assessment which is not signed by anyone (but contains, at the bottom, the names of both Sabrina D. Morris, PCC-S, and Terry R. Hayes, Ph.D., Supervising Psychologist). (Tr. 260). The form, found under a page which says "Welfare Functional Capacity Assessment and Mental Status Exam 12.1.09 - 3 Pages" (Tr. 259), indicates that the last time Plaintiff was examined (apparently by Ms. Morris) was on December 1, 2009. Whoever completed this form concluded that Plaintiff had marked limitations in almost every work-related function and that he was unemployable. Immediately after the form, there is a two-page examination note from Ms. Morris, described as a Professional Clinical Counselor, dated December 1, 2009. In her note, Ms. Morris assigned Plaintiff a GAF of 60, indicating "Serious Symptoms in Some Areas of Functioning," based on diagnoses of major depressive disorder, recurrent, moderate, without psychotic features, and borderline intellectual functioning. She reported his problems with occupational functioning as "Sherman states that he does not believe that he can work because 'I have the mind of a child.'" (Tr. 261-62).

Next, the record contains assessment notes from Tri-County

Mental Health and Counseling Service, Inc., showing that Plaintiff was diagnosed with a dysthymic disorder and, when he began counseling, had a GAF of 45. At that time, he was complaining of depression and anxiety. He was isolated and had suicidal thoughts. He said he left employment at Wal-Mart because he was going to be moved to a cashier position and did not have the math skills to do that job. Later notes show that he was terminated from counseling on June 1, 2010, for missing numerous appointments due to transportation problems. (Tr. 261-81).

Dr. Reece, a psychologist, conducted a consultative examination on December 10, 2009. Plaintiff reported having no friends and no social activities. He said that he suffered from bad nerves and depression. He did not report difficulties getting along with supervisors or coworkers when he was employed. Dr. Reece noted that Plaintiff's prevailing mood was "mildly anxious and dysphoric." Plaintiff described feeling worthless, hopeless, helpless, and full of guilt. His thought process was slow and his ability to abstract similarities was fair to poor. He had problems managing money. His full scale IQ was measured at 67. Dr. Reece diagnosed a depressive disorder and borderline intellectual functioning. He assigned a GAF score of 60. He thought that Plaintiff was mildly impaired in his ability to relate to others, to follow instructions, to perform simple repetitive tasks, and to withstand ordinary work stress. (Tr. 282-86).

Dr. Tangeman, also a psychologist, reviewed the records and expressed an opinion as to Plaintiff's mental residual functional capacity. He thought that Plaintiff had moderate restrictions in his ability to understand detailed instructions, to maintain attention and concentration for extended periods, to get along with others, and to complete a normal workday and workweek

without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In the narrative portion of the form, Dr. Tangeman said that Plaintiff could do 3- to 4-step tasks in a static work environment without strict production quotas, pace or standards, and "would benefit" from superficial interactions with others. (Tr. 288-305).

Plaintiff resumed counseling at Tri-County in November, 2010. The diagnostic assessment form created at that time recited that Plaintiff continued to be depressed and anxious, with occasional suicidal thoughts. He did state that if he got a job, he was afraid he would lose his medical card and would not be able to afford insurance. He was assigned a GAF score of 45 based on a diagnosis of major depressive disorder, rule out dysthymic disorder, generalized anxiety disorder, and mental retardation (severity unspecified). (Tr. 319-29).

It appears that Plaintiff's first appointment with his psychiatrist, Dr. Jones, took place on February 2, 2011. His report of symptoms was unchanged. Plaintiff's speech was clear and coherent; he was oriented and appeared depressed but not anxious. He met the criteria for major depression. Dr. Jones rated Plaintiff's GAF at 55 and prescribed medication in addition to continued counseling. (Tr. 337-40). Later reports show that Plaintiff experienced headaches from the medication but was otherwise doing "okay." He did seek emergency room treatment for headaches. A note from July, 2011, indicated that he had not had headaches for a while and that his suicidal thoughts had become much less frequent. (Tr. 403).

## IV. The Vocational Testimony

A vocational expert, Kenneth Ogren, also testified at the administrative hearing. His testimony begins at page 59 of the record.

Mr. Ogren testified that Plaintiff's past work as a stock clerk was a medium, semi-skilled job. The factory work job was the same. Mr. Ogren was then asked some questions about a hypothetical person who could work at any exertional level, but who had reading and math skills at the 10th grade level and written language skills at the 7th grade level. That person could perform only simple routine tasks in a static environment with no fast paced production requirements and only superficial interactions with others. According to Mr. Ogren, someone with those restrictions could not perform Plaintiff's past relevant work but could perform unskilled jobs like cuff folder, polisher, or inspector. Those jobs could be done by someone who was restricted to work at the light exertional level with a number of postural limitations. However, if the person had more significant mental limitations, such as being unable to maintain attention or concentration for extended periods, to keep a schedule, to be punctual, to sustain an ordinary work routine without special supervision, to make simple work-related decisions, to complete a normal workday or week without interruption from psychologically-based symptoms, or to perform at a consistent pace without an unreasonable number of rest periods (plus several others set forth in the question asked by the ALJ), that person could not work. (Tr. 63-64).

      V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 13-27 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements for disability benefits through June 30, 2011. Next, Plaintiff had not engaged in substantial gainful activity from December 1, 2009 forward. As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had

severe impairments including lumbar radiculitis, obesity, depression, anxiety and borderline intellectual functioning.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level with these restrictions: he could never climb ladders, ropes, or scaffolds; he could stoop, kneel, crouch, or crawl only occasionally; and he could perform only simple, routine tasks in a static environment with no fast-paced production pace and with only superficial interaction with others.  The ALJ found that, with these restrictions, Plaintiff could not perform his past relevant work, but he could perform the jobs identified by Mr. Ogren and that such jobs existed in significant numbers in the State and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI. Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises a single issue.  He contends that the ALJ erred in granting the opinion of Dr. Hayes little weight, arguing that the reasons given by the ALJ for that decision are not supported by the record and that the applicable regulatory factors required that the opinion be given substantial weight.  The Court analyzes this claim under the following standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

As in any case where the sufficiency of the ALJ's decision to reject a medical opinion is at issue, the Court begins with a fairly detailed summary of the ALJ's reasoning. This is what he said on the subject.

After reviewing the pertinent evidence, including Ms. Morris' note, the 2010 records from Tri-County, Dr. Reece's consultative examination report, Dr. Jones' assessment, and Dr. Jones' later notes, the ALJ observed that Plaintiff "admitted that he has developed coping mechanisms to improve mental health symptoms and routine counseling provides good relief" and that "medications have been relatively effective in controlling the claimant's symptoms." (Tr. 23). He then discussed the opinion evidence, giving great weight to the opinion of Dr. Tangeman as being "consistent with the record as a whole ... which contains

only routine mental health treatments and mental status evaluation results that are not severe." He gave somewhat lesser weight to Dr. Reece's evaluation, commenting that it understated Plaintiff's limitations and observing that Dr. Tangeman had access to a greater longitudinal record of treatment than did Dr. Reece. "Very little weight," however, was given to the opinions of the treating sources because their opinions, found in Exhibits 3F and 9F (both are treatment or diagnostic assessment notes from Tri-County) "overstated the claimant's limitations." Finally, the assessment sheet completed by either Ms. Morris or Dr. Hayes was given little weight; the ALJ noted that it was prepared for purposes of a welfare and food stamp evaluation, and that there were few, if any, treatment records showing the presence of marked limitations. (Tr. 24-25).

It is important to note, at the outset, that there is no evidence that Dr. Hayes ever treated or even examined Plaintiff. Plaintiff asserts in his Statement of Errors (Doc. 12, at 5), that Dr. Hayes "apparently" based his assessment on Ms. Morris' examination notes, and the record does support that inference. Consequently, the "treating source" rules do not apply here, and the question is simply whether the record contains substantial support for the ALJ's decision to give little weight to Dr. Hayes' assessment.

The error which, according to Plaintiff, the ALJ committed was to disregard "a substantial portion of the evidence [which] supports the opinion of Dr. Hayes ...." Id. at 9. Plaintiff goes on to point out the initial Tri-County assessment, which assigned him a GAF score of 45; Dr. Reece's evaluation, which revealed low IQ scores and slowness in response to questions; the second Tri-County assessment, which also assigned a GAF score of 45; and Dr. Jones' notes, which included a diagnosis of mental retardation and a GAF score of 55. Plaintiff then analyzes the pertinent factors for assessing a non-treating medical source

opinion, see, e.g., 20 C.F.R. §404.1527(c), and, while conceding that Dr. Hayes never examined or treated Plaintiff, argues that Dr. Hayes' views were supported by Ms. Morris' examination note, were consistent with "a great deal of evidence in the file," including the various GAF scores, and were expressed by a source with the proper qualifications. Id. at 11-12. For those reasons, Plaintiff contends that the ALJ should have given Dr. Hayes' opinions more weight.

As the Commissioner points out in response to this argument, Plaintiff's primary contention, reduced to its essence, is either that the ALJ should have evaluated the evidence differently, or that substantial evidence would have supported a different outcome. Neither of those arguments has any legal merit.

As this Court has said on numerous occasions, "'[w]hen deciding under 42 U.S.C. §405(g) whether substantial evidence supports the ALJ's decision, we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility.'" Jones v. Comm'r of Social Sec., 2012 WL 5378850, *5 (S.D. Ohio Oct. 30, 2012)(quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)), adopted and affirmed 2013 WL 556208 (S.D. Ohio Feb. 12, 2013). "As the Court of Appeals observed in Mullins v. Sec'y of HHS, 836 F.2d 980, 984 (6th Cir. 1987), 'the weight to be given opposing medical opinions ... is clearly not a basis for our setting aside the ALJ's factual findings.' If the ones chosen by the ALJ find 'ample support in the record,' id., a reviewing court may not disturb them." Johnson v. Comm'r of Social Sec., 2013 WL 6062147 (S.D. Ohio Nov. 18, 2013). And "[e]ven if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983)." Gossett v. Comm'r of Social Sec., 2013 WL 6632056, *5 (S.D. Ohio Dec. 17, 2013), adopted and affirmed 2014 WL 49818 (S.D. Ohio Jan. 7,

2014).

Here, Plaintiff's argument completely disregards other evidence in the record which supports the ALJ's findings.  Dr. Reece, who, unlike Dr. Hayes, actually examined Plaintiff (and did so just nine days after Dr. Hayes' checklist of limitations was prepared), found only mild restrictions in Plaintiff's ability to function in all relevant work areas.  Both Dr. Reece and Ms. Morris assigned Plaintiff a GAF of 60, which would generally be inconsistent with a host of marked impairments.  Dr. Tangeman, who is also a psychologist and who was in the same position as Dr. Hayes to make an assessment - he also did not examine or treat Plaintiff - reached contrary conclusions, and, unlike Dr. Hayes, he had the benefit of additional records to review.  The treatment notes, while not containing much discussion of Plaintiff's functional limitations, do refer to some improvement in Plaintiff's condition once he began taking medication - that is in Dr. Jones' last note - and they do not contain any strong or irrefutable evidence of significant deficits in functioning.  There is also direct evidence contradicting some of Dr. Hayes' findings; for example, Dr. Hayes indicated that, in the area of social interaction, Plaintiff had one moderate impairment and four marked impairments, but Plaintiff told Dr. Reece (again, only nine days later) that he had no problems getting along with coworkers and supervisors. (Tr. 283).

Given that both Dr. Tangeman and Dr. Hayes were non-treating, non-examining sources with psychological expertise, and that there are factors in the record which reasonably supported portions of both of their assessments - although there is a fairly sparse amount which shows limitations of the number and severity described by Dr. Hayes - it was for the ALJ to determine which opinion to give the greater weight.  Since his decision to rely more heavily on Dr. Tangeman is a choice that a reasonable

-11-

person, reviewing the same evidence, could have made, this Court lacks the authority to substitute its judgment for that of the ALJ, even if it would have reached a different conclusion - although the Court does not have to decide that question, since it is irrelevant to a "substantial evidence" review.  "In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record." <u>Rogers v. Comm'r of Social Security,</u> 486 F.3d 234, 241 (6th Cir. 2007). For these reasons, it will be recommended that the ALJ's decision be upheld.

## VII. <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that the Court enter judgment in favor of the defendant Commissioner of Social Security.

## VIII. <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a

waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge